Ronald J. Logar --State Bar No. 303
Eric Pulver--State Bar No. 7874
LAW OFFICE OF LOGAR & PULVER, PC
225 S. Arlington Ave., Ste. A
Reno , NV 89501
Tel:    (775) 786-5040; Fax: (775) 786-7544

Michael J. Flynn, Esq., Mass. State Bar No. 172780
P.O. Box 690
6125 El Tordo
Rancho Santa Fe, CA 92067
Tel:    (858) 759-7000 & (858) 775-7624; Fax: (858) 759-0711
*Admitted Pro Hac Vice*

Attorneys for Dennis Montgomery.

FILED _____ ENTERED
COUNSEL / PARTIES OF RECORD

DEC 1 4

CLERK US DISTRICT COURT
DISTRICT OF

BY

# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEVADA

| | |
|---|---|
| UNITED STATES OF AMERICA, ex rel DENNIS MONTGOMERY, an individual<br><br>Plaintiffs,<br><br>v.<br><br>WARREN TREPP, an individual; U.S. CONGRESSMAN JAMES GIBBONS, an individual; eTREPPID TECHNOLOGIES, LLC, a Nevada limited liability company; GENERAL RONALD BATH, an individual; ASCENTIA CAPITAL PARTNERS, LLC, a Nevada limited liability company; SLOAN VENABLES, an individual, PATTY GRAY, an individual; PAUL HARALDSEN, an individual; MICHAEL WEST, an individual and DOES 1 through 20,<br><br>Defendants | CASE NO.: 3-06-cv-691-FiΛΡ<br><br>**COMPLAINT FOR VIOLATION OF THE FALSE CLAIMS ACT 31 U.S.C. §3129, ET SEQ., AND CONSPIRACY TO VIOLATE THE FALSE CLAIMS ACT**<br><br><br>**Pursuant To 31 U.S.C. § 3730 (b)(2), Filed IN CAMERA, Under Seal** |

Montgomery FCA Complaint

## NATURE OF THE CASE

1.      This False Claims Act case arises out of defendant Warren Trepp's scheme to commit fraud on the plaintiff United States Government through government defense contracts, and to gain control and ownership of valuable software exclusively owned, controlled, and solely possessed by relator Dennis Montgomery used on said contracts. In sum, Trepp's scheme to defraud the Government was part and parcel of his scheme to defraud Montgomery. Montgomery's software is valued in the hundreds of millions of dollars and is critical to the war on terror. In order to perpetrate his scheme, defendant Trepp paid hundreds of thousands of dollars to defendant United States Congressman James Gibbons for the purpose of: (i) procuring numerous military contracts requiring the use of Montgomery's software; and (ii) for the corrupt manipulation of the justice system by both Gibbons and Nevada U.S. Attorney Daniel Bogden. Gibbons was instrumental in securing Bogden his job as U. S. Attorney through his substantial influence within the Nevada Republican Party.

2.      At the behest of Trepp and Gibbons, Bogden directed and authorized the Reno office of the FBI to conduct a patently illegal and unconstitutional raid on Montgomery's home and storage facility for the purpose of seizing, in effect, "stealing," the "source codes" to Montgomery's software; and also to prevent Montgomery from blowing the whistle on Trepp, Gibbons, and other federal officials involved with them.

3.      One of these officials is defendant U.S. Air Force special agent Paul Haraldsen, who had worked with Montgomery on several of the contracts, and represented to Montgomery that he, (Haraldsen) had become the designated Government liaison to Montgomery replacing other individuals from ██████ and other US Agencies. Based on Haraldsen's statements, Montgomery believed that Haraldsen was working for USSOCOM (United States Special Operations Command) with direct access to Secretary of Defense Rumsfeld and other high level Defense Department officials. Between early 2004 and January, 2006, Haraldsen had developed a confidential working relationship with Montgomery, had gained Montgomery's trust, and knew the immense value of the software. Montgomery was unaware of Haraldsen's collusive scheming with Trepp and Gibbons, and of his direct connection to Air Force General

2

Ronald Bath until after the raid on his home.

4.      General Ronald Bath, who worked with Trepp and Gibbons in the procurement of military contracts, was also instrumental in using Haraldsen to fabricate and falsify evidence on behalf of Bogden in order to conduct the raid on Montgomery's home and storage facility.   All of the defendants and co-conspirators, named herein as defendants and not named as defendants, conspired and worked together to engineer the raid on Montgomery's home and storage units in order to keep the plaintiff U.S. Government defense contracts flowing to defendant Trepp.

5.      Numerous officials in ▓▓▓▓ and other U.S. Government agencies knew that the software was exclusively developed, owned, controlled, possessed, and operated by Montgomery alone, and that Montgomery zealously and aggressively protected the secrecy of his source codes from *everyone*, including Trepp, multiple Government "consultants" who sought to reverse engineer the source codes, and from agents, employees, and consultants hired by Trepp to either gain access to the source codes and/or to reverse engineer them.

6.      Between September 28, 1998 and January 18, 2006, Montgomery was an independent contractor at eTreppid Technologies.  The "source codes" used on certain military contracts were never on the premises of eTreppid Technologies.

7.      At the time of the raids on March 1 and 3, 2006, defendants Trepp, Gibbons Haraldsen Bath and Bogden knew the following material facts: (i) Trepp had violated certification provisions of plaintiff U.S. Government defense contracts, including illegal payments to Gibbons, and that Montgomery posed a threat to "blow the whistle" on all of them; (ii)  Montgomery had always maintained complete control and exclusive possession of the "source codes" to the software, and he exclusively owned them based on his *written contracts* with Trepp - Haraldsen had possession of said contracts prior to the raid; (iii) there were no means to secure possession of the "source codes" other than by raiding Montgomery's home; (iv) just prior to the illegal raid, Trepp needed the "source codes" to fulfill a military contract recently procured by Gibbons, Haraldsen, and Bath having a value of at least one-hundred million dollars, and more likely having a negotiated value up to five-hundred million dollars – this contract was absolutely essential to the

3

continuation of prior contracts involving the collection, "forecasting," and ███████████ involving the war on terror; (v) Montgomery might have copies of Trepp's personal computer hard-drives revealing, inter alia, cash payments to Gibbons and insider trading by Trepp based on information derived from plaintiff U.S. Government defense contracts and the use of Montgomery's software in the war on terror; and, most significantly, (vi) Montgomery, in February of 2006, just before the illegal raids, was then in contact with several former officials above Gibbons, Haraldsen, and Bath, for the purpose of not only blowing the whistle on Trepp, Gibbons, and Bath, but also for the purpose of having the Government use Montgomery's software in the war on terror in order to save American lives, and thus cutting off Trepp's defense contracts.

8.    Within a month before the illegal raids, (and on previous occasions), Montgomery specifically informed defendant Special Agent Haraldsen that Trepp had paid hundreds of thousands of dollars to Gibbons; and that Montgomery's representatives had contacted several former high level Government officials intending to immediately license his technology to the U. S. Government in order to protect our country. On or about February 6, 2006, unaware of Haraldsen's collusion with Trepp, Bogden and Bath, Montgomery explicitly requested Haraldsen's help in getting Montgomery's software immediately available to the U. S. Government for it's use in the war on terror.

9.    On March 1, 2006, when the FBI raided Montgomery's home, his representatives immediately faxed a letter, attached hereto as Exhibit 1, to Rumsfeld and other high level Bush Administration officials, with copies to several former officials, offering the technology to the Government, informing them of Trepp's background and payments to Gibbons, and requesting their intervention to protect the Country and safeguard the technology for the war on terror.

10.    In February, 2006, Haraldsen had secretly and illegally tape recorded at least several conversations with Montgomery while lying to Montgomery and denying that he was taping their conversations, after Montgomery had explicitly asked him. In at least *three* conversations, Montgomery specifically informed Haraldsen that his representatives had contacted former high level Government officials for the purpose of having them contact high level officials within the Bush Administration and

4

inform them that Montgomery had sole possession of the technology and would make it immediately available to the U. S. Government in the war on terror.

11.     In February, 2006, Montgomery also specifically informed Haraldsen that he intended to blow the whistle on Trepp to high level Government officials with regard to prior cash payments by Trepp to Gibbons; and of Trepp's "insider trading" based on national defense information obtained from various contracts. When Haraldsen suggested that Montgomery should "just sit tight" or words to that affect, until the one hundred million dollar contract was paid by the Air Force, Montgomery began to question Haraldsen's motives and allegiances to protect the Country. At that time, in late February, 2006, realizing that Montgomery was beginning to distrust him, Haraldsen decided with Bath and Bogden to raid Montgomery's home. Using the knowledge derived from his conversations with Montgomery, defendant SA Haraldsen informed Bath, Trepp, Gibbons and Bogden of Montgomery's efforts to contact high level government officials to get the software operative in the war on terror and to blow the whistle on Trepp, Bath and Gibbons.

12.     At all times relevant herein, defendant Haraldsen acted as the conduit of information and as the agent of Trepp, Bath, Bogden and Gibbons, and not for the legitimate interests of the U.S. Government. While Montgomery was processing "output" ███████ several of its field operatives warned him not to trust anyone inside the Government with connections to Trepp, including Bath and Gibbons, and particularly, Paul Haraldsen. In turn, Haraldsen told Montgomery not to trust anyone from ███████, and only to trust him. Throughout 2004 when Montgomery was "forecasting" specific ███████████████, Haraldsen continuously and aggressively sought his companionship and friendship while constantly questioning him about how his software technology was functioning.

13.     In the summer of 2004, Haraldsen informed Montgomery: (i) that there was a "conflict" inside the Government, and that the Air Force would be "taking over" the critical contracts from ███████ at the end of 2004; (ii) Montgomery would be delivering his "output" to Haraldsen; (iii) Montgomery was to confide in Haraldsen alone; and (iv) not to trust anyone but him. At various time during 2005, Montgomery repeatedly informed Haraldsen that he did not trust Trepp, that he was increasingly concerned Trepp was trying to "steal" the technology, that Trepp was giving money to Gibbons, that Trepp owed

Montgomery FCA Complaint

Montgomery millions of dollars, that he did not trust General Bath because Trepp had told him that Bath was soon to become a "consultant" for Trepp upon retirement, and that Trepp was using the "intelligence" Montgomery was then "forecasting" to trade in oil stocks. Haraldsen repeatedly reassured Montgomery that as long as he "processed" the "output," the Government would buy the technology, that funds for a contract for at least one hundred million dollars had already been allocated, and that the Government acknowledged Montgomery's exclusive ownership of the software.

14.     Collectively, Trepp, Haraldsen, Bath, and Gibbons schemed with Nevada U.S. Attorney Bogden to manufacture and fabricate grounds to raid Montgomery's home and seize the software, while knowing they had no constitutional basis to do so. Collectively, U.S. Attorney Bogden, the local Reno FBI, including defendant Special Agent Michael West, and defendants Trepp, Bath, Gibbons, and Haraldsen manufactured, fabricated, and falsified facts in the search affidavit of Agent West in order to obtain search warrants to conduct the raid. Collectively, the defendants perpetrated their scheme to continue the plaintiff U.S. Government defense contracts then in existence, and to consummate the contract then having a value between one-hundred million and five-hundred million dollars.

**PARTIES**

15.     Plaintiff United States of America by and through relator Dennis Montgomery, who is a resident of the State of Washington.

16.     Defendant Warren Trepp is, upon information and belief, a resident of Nevada, and the majority shareholder of eTreppid Technologies, LLC and is its president. At all times relevant herein, Trepp was acting as a principle and agent of defendant eTreppid Technologies, LLC.

17.     Defendant eTreppid Technologies, LLC is a Nevada limited liability company with a usual place of business in Reno, Nevada.

18.     Defendant James Gibbons, is, upon information and belief, a resident of Nevada, and a United States Congressman for Nevada.

19.     Defendant Paul Haraldsen is, upon information and belief, a resident of Virginia, and is a special agent with U.S. Air Force.

20.     Defendant Ronald Bath, is upon information and belief, a resident of Reno, and is a General

Montgomery FCA Complaint

in the U.S. Air Force.

21.     Defendant Ascentia Capital Partners, LLC is, upon information and belief, a Reno investment firm, whose enterprise consists partly of domestic and offshore hedge funds.

22.     Defendant Sloan Venables is, upon information and belief, a resident of Nevada and employed as a security guard at eTreppid Technologies, LLC in Reno, Nevada.

23.     Defendant Patty Gray is, upon information and belief, a resident of Nevada and was employed as an administrative clerk at eTreppid Technologies, LLC in Reno.

24.     Defendant Michael West, is, upon information and belief, a resident of Nevada and a special agent with the Reno FBI.

25.     Defendants DOES 1 through 20 inclusive are sued herein under fictitious names. Their true names and capacities are not known at this time, but the prayer is made that the same may be inserted herein when ascertained. Plaintiff is informed and believes and therefore alleges each of the defendants designated herein as a DOE is responsible in some manner for the events and happenings herein referred to, and proximately caused the damage to the plaintiff as herein alleged.

26.     At all times relevant, each of the defendants acted as the agent for each other defendant in doing the acts complained of herein.  Plaintiff is informed and believes and thereon alleges at all times herein mentioned, each of the defendants acted as the agent, employee, partner, joint venturer, and\or co-conspirator with each of the remaining defendants, and in doing the things hereinafter alleged, was acting within the course and scope of such agency, employment, partnership, and/or joint venture, and/or in furtherance of such conspiracy, and with permission of each co-defendant.

**JURISDICTION AND VENUE**

27.     At all times relevant, the primary acts complained of occurred in the state of Nevada.

28.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and § 1345. Moreover, this action is not barred by any provision of 31 U.S.C. § 3730(e)(1)-(4).

29.     Venue is proper pursuant to 28 U.S.C. §1391(b), 28 U.S.C. §1391(c); and 28 U.S.C. §1391(e), in that, among other reasons, all of the defendants reside in Nevada, or a substantial part of the events or omissions giving rise to the claims occurred in Nevada

Montgomery FCA Complaint

## FACTUAL ALLEGATIONS

30.     eTreppid Technologies, LLC is a government contractor that had contracts with the United States Department of Defense. (hereinafter "DoD").

31.     At all times relevant, *qui tam* plaintiff Dennis Montgomery was a part owner and independent contractor for defendant eTreppid Technologies, LLC.  *Qui tam* plaintiff Montgomery is an original source of information referred to in this complaint.  On February 14, 2004, *qui tam* plaintiff Montgomery was granted a Top Secret clearance with the U.S. Government.

32.     On September 28, 1998, Montgomery and Trepp co-founded Intrepid Technologies, later called eTreppid Technologies, LLC, based on a "Contribution Agreement" of that date in which Montgomery and Trepp agreed to own the LLC in equal 50% shares.

33.     Pursuant to the Contribution Agreement, Trepp put up money and Montgomery conveyed only his "software compression technology" contained on "CD No. 1" to eTreppid.

34.     eTreppid's business plan and the application of the "compression technology" was to compress VHS video tapes used for surveillance in casinos.  Over the preceding twenty years Montgomery had developed and copyrighted other types of software technology, including but not limited to, "Object Detection Software," which was not conveyed to eTreppid and which, per the terms of the "Contribution Agreement," was expressly excluded.

35.     After the formation of eTreppid, Montgomery offered to sell one part of his "Object Detection System" ("ODS") software to Trepp for the sum of five million dollars and another part for the additional sum of five million dollars, which Trepp rejected.

36.     Prior to November of 2002, Montgomery had disclosed and discussed the potential military application of his ODS technologies with various military officials.  Beginning on or about November 2002, on behalf of the U.S. Air Force, Montgomery began work on military application of his technology at Eglin Air Force base to demonstrate the application of his technologies in the war on terror.  Trepp initially expressed reluctance to have eTreppid involved with the Government because of Trepp's past with Michael Milken, but soon changed his mind when he started to comprehend the value of the technology.  Trepp knew the ODS technologies used in the military contracts were not his or eTreppid's because Trepp

and Montgomery had discussed the ODS technologies, it was expressly excluded from the Contribution Agreement, and Trepp agreed Montgomery would be paid a license fee equal to at least 50% of the gross amount paid on any miliary contract.

37.    The U.S. Air Force  entered into its first contract with eTreppid in November of 2002, Contract No. 209545S, based on Montgomery's technology. ▮▮▮▮ the Air Force, Navy, and other U.S. agencies have tested, approved, and utilized the technology in the war on terror, while knowing that only Montgomery knows the source codes that make the software functional.

38.    When Trepp comprehended the magnitude of the value of the ODS, particularly to the U.S. Government, he began to conspire and plan how to steal it from Montgomery.

**Trepp's Background Barred Him From Being A Government Contractor.**

39.    Defendant Warren Trepp has lived off stolen money for much of his adult life.  Trepp's modus operandi has involved financial schemes and scams, particularly when he was Michael Milken's Head Trader at Drexel Burnham Lambert in the junk bond crime wave of the 1980s in which Milken, Trepp, Ivan Boesky, and others stole billions of dollars in the largest financial crime wave in U.S. history. Although Milken paid approximately $1.1 billion dollars in fines, and Trepp paid tens of millions in civil penalties, upon information and belief, additional billions of dollars had been transferred to off-shore accounts and have never been accounted for.

40.    At the infamous X-shaped trading desk, Trepp was the "head trader" for <u>and</u> sat to the immediate right of Junk Bond King Michael Milken <u>while</u> Milken was stealing billions of dollars from innocent investors. A Securities and Exchange Commission judge said Trepp's violations were "egregious, recurring, and intentional.  As Drexel's head trader, he facilitated the sale and repurchase of numerous bonds over a seven-month period, knowing that the combined transactions amounted to a covert . . . agreement." At the time, in the 1980s, Milken was paying Trepp at least $25 million dollars a year to make stock trades.

41.    At all times relevant herein, all defendants and co-conspirators, including Congressman James Gibbons. U.S. Attorney Daniel Bogden, Special Agent Paul Haraldsen, General Ronald Bath, Trepp employees Sloan Venables and Patty Gray, and Special Agent Michael West, were all aware of Trepp's

background as the head trader for Michael Milken, and of his involvement in one of the largest investor scams in this country. More specifically, all defendants knew that Trepp had a national reputation utterly lacking in the "reputation for integrity" required by law as a U.S. Government contractor, particularly in connection with the Government contracts specified herein involving extremely sensitive national defense information vital to the current national security of the U.S.

42.    For the foregoing reason and others, beginning in early 2004, field operatives of ███████ who knew that only Montgomery had exclusively developed, owned, and possessed the software, warned Montgomery to be extremely cautious of any Government officials with close ties to Trepp, including General Bath and James Gibbons. In early 2004, because of Special Agent Haraldsen's then-developing relationship with Montgomery, aggressively pursued by Haraldsen, the same ████ personnel warned Montgomery to be particularly careful of Haraldsen. On the other hand, Haraldsen repeatedly warned Montgomery not to trust ████ that they might attempt to just seize his technology, (as had previously been suggested resulting in a written agreement not to do so) and that because of a "conflict", the Air Force would be taking over the contracts at the end of 2004. Ultimately, beginning in January, 2005, only Haraldsen remained as the liaison between Montgomery and the Government.

43.    Because of their affiliation with the Air Force, specifically involving the military contracts with eTreppid, James Gibbons, U.S. Attorney Daniel Bogden, Special Agent Paul Haraldsen, and General Ronald Bath, all possessed inside knowledge of the immense value of Montgomery's technology to the plaintiff U.S. Government.

## Trepp's Payments To Gibbons

44.    In or about September 2003, one of Trepp's employees or consultants, Lennard Glogauer, contacted Glogauer's personal friend, defendant U.S. Congressman James Gibbons, on behalf of Trepp, and on September 21, 2003, at the home of a mutual friend, introduced Trepp to Gibbons for the purpose of obtaining Gibbons' help with obtaining plaintiff U.S. Government defense contracts.

45.    After Milken was released from prison, he settled in Incline Village, Nevada, as did Trepp, where they were projected as wealthy philanthropists and protected by a community that benefitted from their junk bond money. Eventually, Trepp encouraged and did get Milken to invest in eTreppid

Montgomery FCA Complaint

Technologies, even though Milken was a convicted felon and eTreppid was entering into and did enter into plaintiff U.S. Government defense contracts involving classified or confidential information.

46.     Despite Trepp's well-publicized reputation and history as a financial scam artist, defendant U.S. Congressman Gibbons told *The Wall Street Journal* that Trepp would "never" pay off Gibbons in exchange for U.S. Government contracts, that Trepp was his close personal friend and "like a younger brother," even though they had only met in September of 2003 for the express purpose of procuring military contracts with Plaintiff DoD.

47.     In April of 2004, Trepp and eTreppid paid for a lavish cruise for Gibbon's wife.

48.     On March 3, 2005 Gibbons succeeded in getting plaintiff U.S. Government to enter into contract number LLH-846-03, called the "Eaglevision project," for $1,170,543.17 with eTreppid.

49.     On the morning of March 22, 2005, Jale Trepp, Trepp's most recent wife, said in an e-mail sent only to Trepp:

**"I know you are busy.  Please don't forget to bring the money you promised Jim [Gibbons] and Dawn on the trip."**

50.     Later that same morning, in response to his wife's e-mail, Trepp said:

**"Don't you ever send this kind of message to me!  Erase this message from your computer now!"**

51.     From March 24, 2005 to April 2, 2005, defendants Trepp and eTreppid paid for a private jet flight and lavish cruise costing more than $60,000 for defendant Congressman Gibbons and his family. Although federal ethics rules require a public disclosure by members of Congress when they receive gifts or make reimbursements, Gibbons never reported his lavish family trip/vacation that was paid for by Trepp, until Gibbons was exposed on the front page of *The Wall Street Journal* on November 1, 2006.

52.     On August 30, 2005, through nine different companies all owned and controlled by defendant Trepp, Trepp directly contributed almost $100,000 in reported campaign contributions to defendant Congressman Gibbons.

53.     In April, 2005, upon information and belief, defendant Trepp also paid large sums of unreported secret slush fund money to defendant Congressman Gibbons, including, but not limited to,

Montgomery FCA Complaint

approximately $100,000 in casino chips in April 2005, and $15,000 in cash. In November 2005, while Gibbons was running for Governor of Nevada, Trepp gave Gibbons another $100,000 in cash.

54.     At least from the summer of 2004, defendant Trepp's agenda, goal, and plan has been to buy defendant Congressman Gibbons the Nevada governorship, buy Gibbons influence in securing defense contracts with plaintiff U.S. Government, get Gibbons to name Trepp and his friends to the Nevada Gaming Commission, and buy Gibbons influence over other powerful Nevada Republicans, including Nevada U.S. Attorney Daniel Bogden.

### The Military Contracts And The Federal Acquisition Regulations.

55.     Between the fall of 2003 and January 10, 2006, defendants Trepp, Gibbons (who was a former Air Force pilot and member of the Nevada Air National Guard), and Air Force General Ronald Bath (also a member of the Nevada Air National Guard), and other Air Force officials, including Air Force Special Agent Paul Haraldsen, knew that only Montgomery could create the source codes for his ODS; and that Montgomery protected the secrecy of the source codes as the sole and exclusive owner, including the use of intrusion devices that would cause the software to self-destruct if anyone other than Montgomery attempted to access it. *Qui Tam* plaintiff Montgomery and defendant Trepp repeatedly discussed that Montgomery was only licensing the ODS to fulfill the military contracts and to save American lives in the war on terror. Trepp repeatedly promised to "work out a deal" or "pay the 50%" on the licensing fees satisfactory to Montgomery. During this time, Trepp also attempted to "reverse engineer" the source codes and failed.

56.     Starting on or about 2003, and continuing until 2006, defendant Congressman Gibbons, using his official position as a U.S. Congressman, assisted defendant Trepp and eTreppid in obtaining lucrative government defense contracts with plaintiff U.S. Government, including but not limited to the following contracts numbers: FO8651-03-P-0182; FO8651-03-P-0095; FO8651-03-P-0129; FA8620-04-C-4028; USZA26-03-P-3294; H92222-04-D-0006/DO-0001; H92222-04-D-0006/DO-0002; H92222-04-D-0006/DO-0003; H92222-04-D-0006/DO-0004; CL0328001; SNC03C0011; SNC03C0011/Mod 2; SNC03C0011/Mod 3; SNC03C0011/Mod 4; SNC04C0001/DO-0001; SNC04C0001/DO-0002; SNC04C0001/DO-0003; SNC04C0001/DO-0004; SNC04C0001/DO-0005; SNC04C0001/DO-0006;

Montgomery FCA Complaint

SNC04C0001/DO-0007; SNC04C0001/DO-0008; SNC04C0001/DO-0009; SNC04C0001/DO-0010; LLH 846-03; USZA22-04-D-0006; and F08635-03-C-129.

57.     Each of said defense contracts states in pertinent part, "*The rights and obligations of the parties to this contract shall be subject to and governed by the following document: (a) this award/contract, (b) the solicitation, if any, and (c) such provision, representations, certifications, and specifications, as are attached or incorporated by reference herein. (Attachments are listed herein.)*"

58.     Each said defense contract also has an implicit certification that all laws, regulations and statutes will be complied with.

59.     Defendants Trepp and eTreppid knew the said defense contracts with plaintiff U.S. Government required compliance with all explicit and implicit certifications, laws, regulations, and statutes, including but not limited to, Federal Acquisition Regulations 52.203-3, 52.203-7, 52.203-8, 52.203-10, 52.203-11, 52.203-12, and Section 1352 of Title 13 of the U.S. Code.

60.     Defendant Trepp schemed with defendants Special Agent Haraldsen, Congressman Gibbons, and General Bath to procure plaintiff U.S. Government defense contracts for Trepp and eTreppid.

61.     Defendants Trepp, Gibbons, Haraldsen, and Bath knew that by Trepp signing the said defense contracts on behalf of eTreppid, Trepp was expressly and implicitly certifying that eTreppid would be in compliance with all certifications, laws, regulations, and statutes.

62.     Defendants Trepp and Gibbons knew Trepp was intentionally misrepresenting to plaintiff U.S. Government that eTreppid would be in compliance with the said defense contracts' certifications, laws, regulations, and statutes, including provisions that Trepp and eTreppid would not pay off defendant Gibbons, or other public officials, to obtain said contracts.

63.     Defendant Trepp falsely certified that eTreppid had complied with the said defense contracts in order to induce plaintiff U.S. Government to enter into the said contracts and to pay eTreppid's claims for payment on the said contracts.

64.     Defendant Trepp knew when he signed the said defense contracts on behalf of eTreppid and accepted payment, eTreppid had violated the terms of the said contracts' certifications, laws, regulations, and statutes.

13

65.   Defendant Trepp and eTreppid's intentional breach of said contracts, and their representations to plaintiff U.S. Government were fraudulent.

66.   After August, 2005, Trepp repeatedly told Montgomery that General Bath was "now working for me as a consultant and will go on the payroll as soon as he retired," or words to that effect.

**Trepp's Stock Trades Based Upon Classified Or Confidential Information He Obtained From Defense Contracts With Plaintiff U.S. Government.**

67.   During the summer and fall of 2004, pursuant to said defense contracts with plaintiff U.S. Government, Montgomery's software was then being used by ███████ in connection with the war on terror. Montgomery's software produced "output" consisting of ████████████████████████ ████████████████████████████████████████. After defendant Trepp learned about this classified or confidential information, upon information and belief, he then purchased large amounts of stock through Millenium Capital based upon this inside classified or confidential information that Trepp had learned because of the said defense contracts.

68.   In August 2005, because of work Montgomery was doing for plaintiff U.S. Government pursuant to government defense contracts with eTreppid Technologies, defendant Trepp learned about classified or confidential information about specific oil tanks and refineries in Iraq that could have affected the future price of oil.

69.   Defendant Trepp immediately passed this classified or confidential information onto his so-called investment advisor Steve McCarty, Managing Partner of defendant Ascentia Capital Partners, LLC ("Ascentia).

70.   Defendant Trepp is a controlling partner at defendant Ascentia, even though he is not a registered broker-dealer, and Ascentia disguises Trepp's stock activities through Ascentia.

71.   Upon information and belief, McCarty is really a front for defendant Trepp to do stock trades using classified information.

72.   At all times relevant herein, McCarty and defendant Ascentia, and its partners were aware of Trepp's background as the Head Trader for junk bond king Michael Milken.

73.   In a September 1, 2005 e-mail, Trepp wrote to McCarty at Ascentia:

14

"Hi, . . .Over the next few days and weeks, etc., there will be some very bad things coming out relative to oil. It will have major implications for the economy, oil prices, gas prices and a lot of others!!! Remind the "Boys" you can always buy oil. Regards, W.T. [Warren Trepp]"

74.    Upon information and belief, the term "Boys," refers to Trepp's partners at Ascentia. The information then in the possession of Trepp was derived from specific national defense information derived from the military contracts, which Trepp used in the trading of oil stocks in violation of said defense contracts with plaintiff U.S. Government.

75.    In addition to the said defense contracts' express and implied certifications, set forth above, the contracts contained a "Public Release" clause that states, "*Any information (classified or unclassified) pertaining to this contract shall not be released for public dissemination except as provided in the Industrial Security Manual or unless it has been approved for public release by appropriate U.S. Government authority.*"

76.    Defendant Trepp, and therefore defendant Ascentia, knew the said defense contracts between plaintiff U.S. Government and eTreppid required compliance with the contracts' certifications and non-disclosure provision, and the plaintiff U.S. Government obviously never did and never would approve of defendant Trepp giving stock tips to McCarty, Ascentia and its "Boys," who were Trepp's partners at Ascentia, based upon classified or confidential information Trepp obtained from said defense contracts, particularly information so vital to the national security interests of the United States.

77.    Defendant Trepp, and therefore defendant Ascentia, knew eTreppid would not be in compliance with the said defense contracts when he sent the e-mail and passed along information for investment purposes to McCarty, Ascentia and its "Boys."

78.    Defendant Trepp, and therefore defendant Ascentia, knew when eTreppid accepted payment of the said contracts he violated the terms of the said contracts, including the above "public release," and certifications that they would comply with all laws, regulations and statutes.

79.    Defendant Trepp, and therefore defendant Ascentia, did not inform plaintiff U.S. Government about Trepp's said stock trading in order to induce the U.S. Government to pay on eTreppid's claim for payment on the said defense contracts, and, in fact, the U.S. Government did pay on the said

defense contracts.

80.     In and after August of 2005, upon information and belief, defendant Trepp illegally passed along other classified or confidential information to McCarty and defendant Ascentia, in violation of federally funded contracts, misusing federal defense funds, and engaging in insider trading with classified or confidential information.

81.     If plaintiff U.S. Government knew defendants Trepp and Ascentia were trading with classified or confidential information Trepp obtained as a result of the said defense contracts with plaintiff U.S. Government, it never would have made the payments on the said defense contracts underway at that time, or entered into subsequent contracts with eTreppid.

82.     Between September and December 2005, when Montgomery refused to divulge his source codes to Trepp, Trepp conspired with Haraldsen, Bath and Gibbons to try to steal the source codes and sell a portion of them to the U.S. Air Force for $500 million dollars.

83.     In January 2006, the dispute between Trepp and Montgomery over Trepp's refusal to pay Montgomery for his technology finally erupted and Montgomery left eTreppid on January 12, 2006.

**Trepp, Gibbons, Bath, Haraldsen, And Bogden Used The FBI**
**To Try To Steal The Source Codes.**

84.     In January, 2006, Trepp/eTreppid sued Montgomery and Montgomery sued Trepp/eTreppid, and each side claimed ownership to the source codes used to fulfill the said plaintiff U.S. Government defense contracts.

85.     During this time, defendant Trepp contacted his personal friends, defendant Congressman Gibbons and General Ronald Bath, and relayed to them his problem with Montgomery.

86.     In January-February, 2006, in response to Trepp, Congressman Gibbons called his good friend  U.S. Attorney Daniel Bogden, who had been appointed U.S. Attorney by President Bush at the request of Gibbons. At around the same time, General Bath brought in Special Agent Haraldsen to "set up" and tape record conversations with Montgomery.  Although Montgomery explicitly asked Haraldsen if he was  tape recording their conversations, Haraldsen lied and denied it.

Montgomery FCA Complaint

87.     Gibbons and his wife have admitted that Congressman Gibbons initiated and made phone calls at the behest of defendant Trepp, and was "responsible" for getting  U.S. Attorney Bogden to raid Montgomery's home—which was an illegal raid.

88.     After Gibbons' request, in late January 2006, both U.S. Attorney Bogden and Special Agent Haraldsen instructed Reno FBI Special Agent Michael West to go after Montgomery on behalf of Trepp, thrusting the Reno FBI and U.S. Attorney's office into the civil dispute between Trepp and Montgomery.

89.     U.S. Attorney Bogden and FBI Special Agent West lied, and prepared and filed intentionally false and perjured affidavits containing information fabricated by co-conspirators and defendants West, Haraldsen, Trepp, Venables, Gray, and Trepp for the purpose of justifying the illegal searches based on the following false charges against Montgomery: (i)  violating 18 U.S.C. §793(e) Unlawful Retention of National Defense Information; and (ii) violating 18 U.S. C. § 1832 theft of trade secrets.  These alleged violations were and are just patently false, and the defendants knowingly used said false charges on behalf of Trepp to attempt to steal the source codes to the derivatives of Montgomery's copyrighted technology used for the said plaintiff U.S. Government defense contracts. and to keep those said contracts flowing to Trepp and eTreppid.

90.     On the instructions of U.S. Attorney Bogden, and armed with this intentionally false information, on March 1 and 3, 2006 and previous thereto, Special Agent West lied and/or misrepresented all of the material facts in his affidavit to the Reno United States District Court in callous disregard of Montgomery's rights, obtained search warrants entirely based upon knowingly false representations, and then illegally raided Montgomery's home and storage units, putting the prestige of the Reno U.S. Attorney's office behind Trepp, a notoriously bad character.  Said unconstitutional raid was in direct violation of Montgomery's Fourth Amendment rights, and ignored national DOJ policy, including policy that the U.S. Attorney should *not* get involved in civil disputes between two potential owners. as set forth in DOJ *Prosecuting Intellectual Property Crimes Manual*, § VIII B.6e, and other policies, procedures and rules and regulations in CCIPS.

91.     On or about March 1 and 3, 2006, at the time of said raid, Gibbons, Bath, Haraldsen. and

17

Trepp had secured a military contract with the Air Force entirely based on Montgomery's software, for at least One Hundred Million Dollars. At that time, each of said defendants and Bogden knew Montgomery, not Trepp, owned and exclusively possessed the source codes required to fulfill said contract, and their only means of obtaining the source codes was to seize them from Montgomery. By illegally raiding Montgomery's home and storage units on March 1 and 3, 2006 to steal his technology in order to use said technology in ongoing plaintiff U.S. Government defense contracts and to keep those contracts flowing to defendants Trepp and eTreppid, (who was paying off defendant Gibbons), each of said defendants, and U.S. Attorney Bogden and Special Agent West not only perpetrated a fraud on plaintiff U.S. Government, *they wilfully prevented Montgomery from providing the technology to the Government to save American lives.*

**The Defendants' Knew By Conducting Said Raid They Were Jeopardizing American Lives, "Stealing" The Technology, And "Stealing" Hundreds Of Millions Of Dollars.**

92.　Most significantly, at the time of said raid, as a result of Haraldsen's tape recorded conversations with Montgomery, Trepp, Gibbons, Bath, Bogden, and Haraldsen all knew Montgomery had been in contact with several former high level Government officials, above them, who were discussing with Montgomery's representatives the immediate licensing of the technology to the Government in order to save American lives in connection with the war on terror.

93.　Haraldsen, Bogden, and Bath specifically knew that these former high level Government officials, including an Air Force general, had been in direct contact with high level officials within the Bush Administration for the express purpose of getting the technology operative in order to continue Montgomery's "forecasting" of potential terrorist threats to our country.

94.　Haraldsen, Bath, and Trepp also knew Montgomery had inserted "intrusion protocols" in all of his software while serving as an independent contractor at eTreppid, and Montgomery routinely inserted "intrusion protocols" in software Montgomery was then developing at his home in order to protect his software from Trepp and others who sought to steal it.

95.　Haraldsen and each of the other defendants knew that by attempting to seize the source codes to the software by conducting a patently unconstitutional raid, they would then disrupt Montgomery's

1  continued efforts to secure for the United States the continuous "forecasting" of potential terrorist threats.

2  Notwithstanding this knowledge, defendants Trepp, Gibbons, Bath, Bogden, and Haraldsen placed their

3  greed, based upon their "connection" to Trepp, a notoriously greedy individual in the possession of millions

4  of dollars of Drexel/Milken  Junk Bond monies, ahead of their responsibility and loyalty to the United

5  States.

6      96.    Conclusive proof of this fact and conclusive evidence of the true motives of these defendants

7  is found in their conduct to assist Trepp and Gibbons in raiding Montgomery's home, rather than

8  connecting Montgomery directly to Bush Administration officials for the purpose of utilizing the software.

9  Indeed, after Montgomery sent his letter to Bush Administration officials on March 1, 2006, attached hereto

10  as Exhibit 1, *each of said defendants did everything in their power to block and undermine Montgomery's*

11  *access to the Air Force, to the Department of Justice, and to USSOCOM and to the Bush Administration*

12  *and to thwart his efforts to provide the technology to the Government while knowing it was vital to the*

13  *security interests of the United States.*

14      97.    After Montgomery left eTreppid on January 12, 2006, each of said defendant Government

15  officials had a simple choice to make: either protect the Government as they were sworn to do and

16  safeguard the technology for purposes of national security knowing that Montgomery was trying to deliver

17  it to the Government; or serve Trepp and his financial interests and attempt to "steal" it for Trepp knowing

18  he didn't develop, own or possess the technology, and that he had no ability to use it in the war on terror.

19  They each chose to lie and cheat with Trepp because of greed and the collusive scheming of Trepp, Gibbons

20  and Bath.

21      98.    Each of them knew that Montgomery had repeatedly stated to Haraldsen in their illegally

22  recorded conversations that Montgomery was then doing everything in his power to make the technology

23  available to the Government, get the software operative, and  give the "output" to the Government to save

24  American lives.  They each knew from Haraldsen that Montgomery and his representatives knew that Bath

25  and Gibbons were in collusion with Trepp, and that said representatives were going around them for the

26  express purpose of getting the technology to the Government and blowing the whistle on Trepp, Bath, and

27

Montgomery FCA Complaint

Gibbons. (Unfortunately, at the time, prior to the raid, based on Haraldsen's statements to Montgomery, Montgomery still trusted Haraldsen believing he was not in collusion with Bath and Gibbons.)

99.     General Bath also knew from his position as an Air Force General that Montgomery was then attempting to contact high level Bush Administration officials to secure the technology for the United States. Indeed, notwithstanding Haraldsen's repeated efforts to entrap Montgomery in these conversations, Montgomery repeatedly disclosed and discussed his intent to contact the Bush Administration to secure his technology for the United States. It is imperative for the Government to obtain *all* of the tape recordings of Haraldsen before he destroys them. It is imperative for the Government to secure each and every memo, email, document, and the notes of everyone involved within the Government in order to substantiate and track all of the efforts of these defendants and other Government officials working and/or communicating with them, including but not limited to the following: Peter D. Keisler; Greg Addington: Vincent M. Garvey; Carlotta Wells; W. Kipling At Lee, Jr.; ███████████████ John B. Hennessey; Paul Pugliese; Ronald Rachow; all agents and supervisors in the Reno office of the FBI; ███████ to be identified in camera; John Negroponte and all individuals involved in securing his declaration;

100.    Haraldsen, Bath, and Bogden, as officials of the Government, knew before the raid that all they had to do was to connect Montgomery and his representatives to the appropriate officials within the Bush Administration in order to safeguard the technology for the United States. However, they knew in doing so, they would secure the technology for the Government, but they would personally lose millions of dollars for themselves and hundreds of millions of dollars for their friend Trepp. There is simply no other logical explanation for their conduct. Haraldsen's interactions with Montgomery constitute conclusive evidence with respect to the motives of each and every individual involved herein. Instead of linking Montgomery to USSOCOM, Donald Rumsfeld, the Secretary of the Air Force, the Secretary of the Navy (who was at eTreppid) and others who knew about Montgomery's "forecasting" software, Haraldsen, Bath, and Bogden, at the behest of Trepp and Gibbons, raided Montgomery's home attempting to steal the technology for Trepp.

101.    Notwithstanding the criminal conduct of these Government officials, including Bogden,

20

Bath, Gibbon, and Haraldsen – the local Reno political power structure –  Montgomery later received the help of true patriotic Americans and was able to circumvent them. He then  freely gave the "output" from his technology to the Bush Administration, and this "output" subsequently and correctly forecasted a specific terrorist threat saving the lives of potentially thousands of Americans.

102.    The criminal conduct of these Government officials, as well as Trepp, Venables, Gray, and West, is demonstrably proven in the falsehoods, fabrications, distortions, and outright lies found in the West affidavit to obtain the search warrants.  As previously stated, the search warrants were primarily based upon the falsehood that Montgomery had taken "classified information."

### The "Unlawful Retention Of National Defense Information" Was A Lie.

103.    After the illegal raids, Montgomery immediately challenged the plainly unconstitutional raids with a Rule 41 (g) Motion in court.  Shortly thereafter, U.S. Attorney Bogden, Special Agents Haraldsen and West, as soon as challenged, were forced to admit there was no "classified information" in Montgomery's possession at the time of the search.  Said admission was made because they could not get an "Original Classification Authority" (an "OCA") to join their fraud and sign a document retroactively "classifying" information that had never been classified to begin with.

104.    U.S. Attorney Bogden, defendants Haraldsen, West, and other government officials, and defendants Trepp, Venables, Gray, and others, falsely, and in reckless disregard of the truth, lied and or committed perjury in order to fabricate the claim that Montgomery was illegally in the possession of "classified information."   Otherwise, Bogden and West knew they had no legitimate means to search Montgomery's home and storage units and to illegally seize Montgomery's source code used on plaintiff U.S. Government's defense contracts.  On the instructions of U.S. Attorney Bogden, Haraldsen, West, and their defendant co-conspirators knowingly misled the judge issuing the warrants with respect to the following specific falsehoods in order to seize Montgomery's source codes used on the said plaintiff U.S. Government's defense contracts:

a) No "national defense information" and/or "classified information" was ever properly classified at eTreppid Technologies pursuant to the requirements of "Executive Order 13292" and/or "The National

21

Industrial Security Program Operating Manual" (the "Security Manual").  Bogden, Haraldsen, West, Trepp, Venables, and Gray knew this months before the search and the preparation of the knowingly false affidavits, because they were at eTreppid, observed the failure to comply with "classification protocols" and were explicitly informed by other officials of the U.S. Government that none of the protocols required by the Security Manual were being complied with. Haraldsen and West are specialists within the Air Force and FBI, respectively, in dealing with "classified information." They were informed months before the illegal raid by Montgomery, court filings, an agency in the Government, and by other Air Force officials that there was no "classified information" at eTreppid that Montgomery could be charged with taking.

b) During the duration of the military contracts between November 2002 and September 2005, Montgomery was the *only* person at eTreppid with a Top Secret SCI clearance who actually worked on the contracts with *his* software. Thus, Montgomery was entitled to possess any "national defense information" or "classified information" relating to said contracts that was properly marked and designated by an "original classification authority," pursuant to Executive Order 13292 and The Security Manual. Accordingly, he could not be prosecuted for possessing what he was lawfully entitled to possess. On or after January 10, 2006, defendants Haraldsen, West, Trepp, and Venables concocted a scheme to have Venables and eTreppid attempt to cancel Montgomery's Top Secret clearance on the "official request of Venables and Trepp" with knowingly false statements and while knowing only the government could cancel Montgomery's clearance. Defendants Haraldsen, Trepp, and Venables, acting in concert, specifically violated Montgomery's rights under Executive Order 10865 and Department of Defense Directive 5220.6 requiring, inter alia, notice and a hearing in connection with any suspension or revocation of a security clearance. In fact, Montgomery's clearance has never been canceled. Bogden, West, Haraldsen, and others knowingly misled the judge issuing the warrants with respect to Montgomery's entitlement to possess "classified information."

c) eTreppid Technologies did not have a facility clearance, and could not "store" or "handle" any "classified information" in the possession of Montgomery. Haraldsen and West knew eTreppid did not have a "facility" clearance because they personally had investigated eTreppid's lack of security protocols

.22

to store and handle "classified information." and they knew eTreppid was incapable of implementing the

rules and regulations in The Security Manual.  They also knew the Manual required Warren Trepp to have

a "reputation for integrity" in order to obtain a "facility clearance."  In fact, Trepp did not have a reputation

for integrity; instead, Trepp had a reputation as a financial criminal that had been extensively documented

by the FBI.  In order to obtain the search warrants, Trepp, Gray, and West conspired to falsify eTreppid's

right to "store" the "classified information" they falsely claimed Montgomery had taken.  Pursuant to this

scheme, West stated under oath in his search affidavit that the DoD had issued a clearance to "store" the

"classified information" allegedly stolen by Montgomery in "Form DD 254."  This was a knowing

falsehood by West and Gray.  Form DD 254 had been typed up by Gray and never signed by an OCA on

behalf of the Government.  Yet, at Nevada U.S. Attorney Bogden's direction, his office attempted to

mislead the court that issued the warrants as late as August 17, 2006 in an evidentiary hearing relating to

the illegal raids.

d)  Defendant Trepp had a national reputation for being involved in the largest criminal enterprise

involving securities fraud in the history of the United States, which prevented eTreppid from not only

obtaining a facilities clearance, but prohibited the FBI from relying on him as a credible source.  Trepp's

reputation had been documented by the FBI in their investigation of Trepp when he applied for a facilities

clearance years prior to the search.  Trepp's background, history, and participation in criminal conduct were

documented in an extensive FBI file concerning Trepp that covered at least the previous fifteen years.

Nevada U.S. Attorney Bogden, Haraldsen and West knew pursuant to the protocols established in FBI

investigations and operations manual (MIOG), they should not rely on Trepp as a reliable source for

purposes of obtaining a search warrant; and seeking a search warrant relying on Trepp as a credible source

was contrary to basic established law and judicial precedent.

e)  Prior to the illegal raid on Montgomery's home, the FBI and other U.S. governmental agencies

knew or should have known Trepp was implicated in an investigation in the State of Ohio along with an

already then indicted co-conspirator for, *inter alia*, money laundering and RICO violations involving the

sale of another one of Trepp's companies used in a state pension fraud scheme.  Thus, prior to the search,

the FBI knew Trepp was neither a credible nor a reliable source, had an ulterior motive, and was seeking to steal over $500 million of Montgomery's software.  Nevada U.S. Attorney Bogden, Haraldsen and West, and others knowingly misled the judge issuing the warrants with respect to Trepp's criminal background and lack of credibility.

f)  The "classified information" basis to raid Montgomery's home was a fraud by  U.S. Attorney Bogden, defendants Haraldsen, West, Trepp, Venables, Gray, and others, against Montgomery and the court, and the aforementioned Bogden and defendants knew it, because, like a security clearance. the *Government* is charged with knowledge of its own "classified information."  By Executive Order 13292 and comprehensive  regulations, encapsulated in the Security Manual. and acting through an "Original Classification Authority" (an "OCA"), *only* the Government determines, designates, owns, and specifically "marks" what *it* deems to be "classified information,"– not eTreppid, not its employees, not Bogden and West. U.S. Attorney Bogden and Special Agent West were required to tell the requisite branch of the government of their findings.  Since the Government, by law, is charged with the duty of "classifying" information, its agents, by law, including Bogden, Haraldsen, and West, are charged with knowledge of what is "classified," and the duty to ascertain it.

### The Alleged Theft Of Trade Secrets Was A Lie.

105.    At the time of this illegal raid, U.S. Attorney Bogden, Special Agents Haraldsen and West, and other U.S. officials knew the official policy of the DOJ Computer Crimes and Intellectual Property Section and the Intellectual Crimes Department of the U.S. Attorney General's office was to treat the creator and developer of software who preserved the secrecy of his source codes as the true owner.

106.    Acting on the instructions of Nevada U.S. Attorney Bogden. Special Agent West illegally raided Montgomery's home and storage units in violation of the rules and policies of the "CHIP (Computer Hacking and Intellectual Property) Units of the Department of Justice, which control the investigation and prosecution of intellectual property crimes, specifically violated the written policy of the CHIP units as found in CCIPS and other CHIP manuals, and Bogden and West knowingly misled the judge issuing the warrants with respect to the following material facts, in addition to the material facts set forth above:

a)   Montgomery is a 50% owner of eTreppid.  The CCIPS Guidelines prohibit the criminal investigation and prosecution of Montgomery as an owner of "trade secrets."  Said CCIP Guidelines prohibit the prosecution of one owner based on the complaint of the other owner engaged in a dispute over the ownership of intellectual property.

b)   Montgomery owned the copyrights and derivatives to the ODS technology used in the U.S. Government contracts and vigorously protected the secrecy of the source codes to the software with specific intrusion protocols and by diligently preventing Trepp and any of his agents, employees, and henchmen from obtaining the source codes.  The CCIPS Guidelines prohibit the investigation and prosecution of Montgomery as the owner of the copyrights in the software technology.  Said guidelines explicitly recognize the creation and control over the source codes and the protection of the secrecy of the software as the strongest indicia of ownership.

c)   Montgomery, as the sole creator of the subject software, could engineer and/or reverse engineer said codes at will.  Thus, under CCIPS Guidelines he could not be the "subject" of a legitimate criminal investigation and could never be prosecuted for stealing his own software.

d)   **The Contribution Agreement**.  As set forth in the Contribution Agreement in the possession of Special Agents Haraldsen and West prior to the illegal search, Montgomery "only" conveyed "that compression software contained on CD No. 1" because they had discussed the matter with Trepp, and they all agreed to raid Montgomery's home without conducting any comparative tests in order to seize software which they knew was not on "CD No. 1" and had never been conveyed to eTreppid.  A simple test to run the software on CD No.1 and to compare the results to the tests conducted in performance of the U.S. Government contracts would have proven to all of the conspirators that Montgomery, not Trepp or eTreppid, owned the software at issue.

e)   Special Agent West lied to obtain the warrants by intentionally deleting the language that Montgomery only conveyed "that compression technology contained on CD No. 1" while knowingly misleading the judge issuing the warrants that Montgomery had conveyed "all of his copyrights...patents... software..." etc. to eTreppid.  Special Agent West also intentionally deleted the very next clause in the

25

Contribution Agreement reciting that Montgomery was explicitly not conveying any of his technology not contained on CD No. 1. The use of the explicitly false affidavits and the failure to do the testing is evidence of their specific intent to steal the technology for Trepp. Bogden, West, Haraldsen, and other U.S. officials knew the affidavits were explicitly false because they had possession and/or access to Montgomery's federal copyright complaint attaching the copyrights. Bogden, West, and Haraldsen and other U.S. officials knowingly misled the judge issuing the warrants.

f)    **The Operating Agreement**.   As if the foregoing deception was not enough, the Reno office of the FBI intentionally deleted the key phrase from the Operating Agreement, which also altered the entire meaning of what Nevada U.S. Attorney Bogden and Special Agent West were declaring to the court.  In order to try to show the court that Montgomery was bound by an "Agreement Not to Compete," preventing him from disclosing and/or using "trade secrets" after he left eTreppid, and/or from using "any" of the "Technology" he worked on at eTreppid "in competition" with eTreppid, Nevada U.S. Attorney Bogden and defendant West falsified the precise sentence in the search affidavit relating to these issues.   It intentionally deleted the following bold and underlined phrase: "So long as MONTGOMERY is appointed as a Committee Member and/or as Chief Technology Officer pursuant to this Agreement, MONTGOMERY and his Affiliates, agree that, during the term of this Agreement, none of them shall compete with the LLC, whether for their own account and/or for the account of others, individually, jointly with others, or as a part of any other limited liability company, limited partnership, general partnership, joint venture, corporation or other entity, by: (i) developing, licensing or exploiting in any manner any software programs or other technology which is competitive with the Technology or the Business of the LLC or providing any services or supplies which are encompassed within the definition of the "Business" of the LLC set forth in this agreement" . . . . The Agreement Not to Compete was only valid "[s]o long as Montgomery is appointed as a Committee Member an/or as Chief Technology Officer." Nevada U.S. Attorney Bogden and Special Agent West knew Montgomery was no longer Chief Technology Officer and West never checked to see if Montgomery was still a Member.

g)    If the Bogden, Haraldsen, West, and the Reno FBI office had not deleted these key phrases,

26

then the court would have known the only written conveyance by Montgomery of source code that might constitute a trade secret  was the specific source code belonging to eTreppid "contained on CD No. 1." Moreover, if they had not deleted the crucial phrase in the Operating Agreement, the court would have known Montgomery was not subject to  an "agreement not to compete," and that Montgomery claimed ownership to all of his intellectual property not "contained on CD No. 1," and expressly excluded in the "cut off" paragraph.  Alternatively, if they were attempting to obtain a warrant for the  source code "contained on CD No. 1," there was no "particularity" in the warrants referencing either "CD No. 1," or the source codes on it.  Also, their own fabrications prevented them from claiming that Montgomery had even stolen CD No. 1 because they never informed the court that CD No. 1 existed.  Thus, their intentional falsehoods in these two crucial documents  were a fraudulent attempt to deceive the Court with respect to ownership, and circumvented the "particularity" required under the Fourth Amendment, and directly undercut probable cause to support a "theft of trade secrets."

h)     **Montgomery Was Not An "Employee."**  Special Agent West stated that in 2000-2001, Montgomery assigned ten patents to eTreppid "developed by Montgomery while an employee at eTreppid." This statement was false. West admitted he used the assigned patents to prove Montgomery's alleged status as an "employee," which was  false because the patents contain no reference to his status as an employee, and he did not ask Trepp for W-2s during the critical years 2000 to 2002  when even eTreppid treated Montgomery as an independent contractor.   The inclusion of the patent assignments, coupled with the deletions from the foregoing agreements, created the additional false impression that Montgomery had conveyed "all" of his technology in the allegedly "stolen" trade secrets to eTreppid, which is also false, and that the technology embodied in the patents was the "stolen eTreppid Source Codes."  West tried to deceive the judge on these facts.  First, by law, there can be no trade secret in patented software because the source codes are public.  Second, the patents only relate to the source codes on CD No. 1, which Montgomery had already conveyed, and not the codes used on plaintiff U.S. Government's said defense contracts. Cumulatively, these falsehoods were designed to mislead the court into believing Montgomery was an "employee" who had taken classified information, who had transferred all of his "Technology" to eTreppid,

27

and who was barred from even possessing eTreppid trade secrets for any of the stated restrictions, i.e., "developing, licensing or exploiting" etc., that "all" of the "Technology" and "software programs" were owned and possessed by eTreppid, and that Montgomery was prohibited from using "Any Technology" "in competition" with eTreppid.  Every one of these representations were and are completely false—all contradicted by the deleted phrases, West's admissions, and the Government's own documents.

i)      Montgomery had the absolute right, as the sole owner of the ODS technology, as the sole owner of the copyrights to said technology, and as the 50% owner of eTreppid, to possess any form or component of said technology, whether software or hardware, whether identified as "eTreppid Source Code" as recited in the illegal warrants and accompanying affidavits, or otherwise, which the FBI acting in concert with Trepp, have falsely identified as being owned by eTreppid Technologies and as constituting "trade secrets" within the purview of 18 U.S.C. 1832.  In sum, Trepp and his co-conspirators, as set forth herein, knew, or recklessly disregarded the fact that only Montgomery owned, possessed, and had copyrighted the actual mathematical algorithms constituting the source code in dispute. They knew Trepp had failed to obtain it in a previous hearing on February 7, 2006 on Trepp's Motion for a Preliminary Injunction. Thus, they knew the only way they could obtain the secret source code was to steal it while acting under the pretense of the color of law.  They knowingly misled the judge issuing the warrants as to the collective ownership issues involved in the source codes which they knew only Montgomery had the right to possess, as demonstrated throughout his history at eTreppid.

j)      In bad faith, and in violation of the requirements of the FBI investigation protocols (MIOG) and DOJ protocols in the investigation of "citizen complaints," and in violation of CCIPS, and the explicit internal directives of the CHIP Units, no one within the FBI, DoJ, the U.S. Attorney's Office, or the Attorney General's Office, including, but not limited to, Bogden, Haraldsen, West, and others, ever contacted Montgomery to get his side of the story.  Yet, there were court filings documenting Montgomery's ownership.  The Reno U.S. Attorney's office and FBI breached their own protocols. Notwithstanding this failure, defendants Trepp, Bogden, and West, at the time of the illegal search, had access to all of Montgomery's filings and the transcript from the hearing on the preliminary injunction,

28

including the fact eTreppid only had a non-exclusive oral license to use Montgomery's technology which was embodied in copyrights then on file in the preliminary injunction hearing and in the federal copyright complaint filed by Montgomery. Moreover, the Reno U.S. Attorney's Office and the FBI was advised of these facts in writing on March 1, 2006, the day of the illegal raid. Yet, it then raided Montgomery's storage facility on March 3, 2006, two days after receiving notice of the material facts.

k) The "source code" technology Haraldsen, West, and Trepp falsely claimed in the search affidavits to be a "trade secret" was actually developed by Montgomery years prior to becoming an owner of eTreppid, and was embodied in his copyrights dating back to the 1980's, and not within CD No. 1 as defined in the Contribution Agreement. The FBI and Trepp, acting in concert, knew pursuant to the protocols established in CCIPS the Government had the burden of establishing probable cause that Montgomery was not the owner of said software and that any "taking" by Montgomery was "proprietary." Because Montgomery is the owner of the technology, any attempted seizure of Montgomery's property, i.e., the source codes, is in direct violation of the U.S. Constitution's Fourth Amendment (illegal search and seizure), the Fifth Amendment (deprivation of property), 17 U.S.C. § 506 (a)(1)(A), 18 U.S.C. §2319(b) (theft of copyrights), 18 U.S.C. §1832 (theft of trade secrets), and in explicit violation of CCIPS.

l) Bogden, Haraldsen, West, and Trepp and other U.S. officials also knew Montgomery had executed "patent applications" on behalf of eTreppid relating to the "compression technology" conveyed by Montgomery to eTreppid, and pursuant to law, software source codes contained in "patent applications" could never be "trade secrets," and, therefore, could never be the subject of a search warrant alleging violations of 18 U.S.C. §1832 (theft of trade secrets). Bogden, Haraldsen, West, Trepp and others knowingly misled the judge issuing the warrants on this point claiming the patents were part of the "stolen" source codes.

107. As a result of the foregoing conduct, Montgomery's counsel attempted to communicate with several of the highest officials within the U.S. Government in the hopes of exposing Trepp's corrupt influence, thwarting Trepp's efforts to steal the technology, and thus assist in saving American lives with Montgomery's technology used on the said plaintiff U.S. Government defense contracts. Unfortunately,

Trepp's corrupt influence within the ███████ the Air Force, the Air Force General Counsel's Office, and the Republican power structure of Nevada has, so far, blocked Montgomery's patriotic efforts.

108.   If plaintiff U.S. Government had known what Trepp and his co-conspirators were doing, as set forth above, it would have affected its decision to pay on the said government defense contracts and or it would not have contracted with eTreppid and Trepp, and/or made payments on these said contracts.

109.   As a direct and proximate result of the foregoing violations of the government contracts, defendant Trepp and his co-conspirators made substantial profits at the expense of plaintiff U.S. Government.

110.   Also, as a result of the foregoing, Montgomery has been deprived of the use of his technology and the U.S. Government has been deprived of a potent weapons in the war on terror, all resulting from the greed and corrupt influence of defendant Trepp and his co-conspirators, including, but not limited to, Congressman Gibbons, U.S. Attorney Bogden, Special Agents Haraldsen and West, Trepp and his employees, Venables and Gray.

**FIRST CAUSE OF ACTION**

**___Violation Of The False Claims Act For Violating eTreppid Defense Contracts' Express and Implied Certifications, Laws, Regulations And Statutes—Against All Defendants, Except Ascentia Capital Partners, LLC.**

111.   Plaintiff realleges and incorporates by reference each allegation contained in paragraphs one through 110 as though restated here in full.

112.   As set forth above, defendants Trepp and eTreppid, with the aid of their co-conspirators set forth above, violated the following provisions of 31 U.S.C. § 3729 (a):

(1)   knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval;

(2)   knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government;

(3)      conspires to defraud the Government by getting a false or fraudulent claim allowed or paid.

113.     Defendants Trepp and eTreppid breached their said defense contracts with plaintiff U.S. Government as set forth above including, but not limited to, as follows: the aforementioned contracts required compliance with certain conditions as a prerequisite to payment; the aforementioned contracts expressly and implicitly certified that Trepp and eTreppid were in compliance with all certifications, laws, regulations, and statutes, including federal acquisition regulations; defendants Trepp and eTreppid failed to comply with the said defense contracts express and implicit certifications, laws, regulations, and statutes because they were paying unreported money to U.S. Congressman Gibbons in exchange for his efforts to assist eTreppid in winning lucrative defense contracts; the defendants falsely certified they had complied in order to get plaintiff U.S. Government to pay on the said contracts; Trepp and eTreppid knew the said defense contracts were, in part, obtained with illegal and or illegitimate kickbacks, contributions and or gifts to public and government officials, including Congressman Gibbons; Trepp and eTreppid were diverting profits from the said defense contracts to payoff public and government officials, including Congressman Gibbons; and Trepp and eTreppid failed to disclose and intentionally concealed in their submission of claims to plaintiff U.S. Government the aforementioned non-compliance with said defense contracts' express and implicit certifications, laws, regulations and statutes.

114.     As set forth fully above, on each government defense contract, defendants Trepp and eTreppid knowingly engaged in non-compliance with the said defense contracts' express and implicit certifications, submitted false forms for payment to plaintiff U.S. Government, and received payments pursuant to those false forms.

115.     In reliance on defendant Trepp and eTreppid's false submissions, payments were made by plaintiff U.S. Government to eTreppid for Montgomery's work on each said defense contract.

116.     Each request for payment on each said government defense contract was a false claim or report under 31 U.S.C. § 3729.

117.     Defendants Trepp and eTreppid had actual knowledge they were knowingly misrepresenting

31

to plaintiff U.S. Government that they were in compliance with the said government defense contracts' express and implied certifications, laws, regulations, and statutes, as set forth herein, when they knew they were not, or, in the alternative, acted in deliberate ignorance or reckless disregard of the truth or falsity of the information.

118.    As a direct and proximate result of their violations of the False Claims Act, plaintiff U.S. Government has suffered and continues to suffer damages in an amount to be determined at trial, but in excess of any jurisdictional minimum of this Court.

119.    Plaintiff U.S. Government is entitled to treble damages together with punitive damages of $10,000 for each of the false claims as provided in 31 U.S.C. § 3729(a).

## SECOND CAUSE OF ACTION

**Violation Of False Claims Act For Misuse Of Classified or Confidential Information In Violation Of Defense Contracts' Express And Implied Certifications, Laws, Regulations and Statutes—Against Trepp, eTreppid and Ascentia Capital Partners, LLC, Only.**

120.    Plaintiff realleges and incorporates by reference each allegation contained in paragraphs one through 119 as though restated here in full.

121.    As set forth above, defendants Trepp and eTreppid, with the aid of their co-conspirators, including Ascentia, violated the provisions of 31 U.S.C. § 3729 (a).

122.    As set forth above, Trepp obtained classified or confidential information from Montgomery's work on government defense contracts, and Trepp passed that information along to the public, including his trading "Boys" through McCarty at Ascentia, so they could make money from this inside classified or confidential information.

123.    McCarty and Ascentia knew about Trepp's background with Milken, yet they passed Trepp's tip onto Ascentia's partners knowing Trepp was in violation of eTreppid's said defense contracts by passing along said classified or confidential information.

124.    By passing along the said information Trepp and Ascentia were misusing classified or confidential information obtained from plaintiff U.S. Government's federally funded defense contracts,

misusing federal funds, and or insider trading with classified information, all in violation of eTreppid's contracts with the plaintiff U.S. Government, including express and implied certifications in the said contracts.

125. Each and every trade done based upon information Trepp gave to McCarty and Ascentia, which Trepp obtained as a result of the said government defense contracts, was a violation of the said defense contracts.

126. Defendants Trepp and Ascentia knowingly, or in the alternative, recklessly and/or in deliberate disregard for the truth, used inside classified or confidential government information to capitalize in the stock market in violation of the law, including eTreppid's said contracts with plaintiff U.S. Government.

127. Trepp and eTreppid failed to disclose and intentionally concealed in their submission of claims to plaintiff U.S. Government the aforementioned inside trading with classified or confidential information.

128. Had plaintiff U.S. Government known that Trepp, McCarty and Ascentia were engaged in said illegal conduct, and they were trading stocks with information Trepp obtained as a result of the said government defense contracts, it would have affected plaintiff U.S. Government's decision to pay.

129. As a direct and proximate result of Trepp and Ascentia's violations of the False Claims Act, plaintiff U.S. Government has suffered and continues to suffer damages in an amount to be determined at trial, but in excess of any jurisdictional minimum of this court.

130. Plaintiff U.S. Government is entitled to treble damages together with punitive damages of $10,000 for each of the more than 2,000 false claims as provided in 31 U.S.C. § 3729(a).

## THIRD CAUSE OF ACTION

**Violation Of False Claims Act For Violations Of The Express And Implied Certifications On Government Contracts, To Keep The Defense Contracts Flowing To Trepp And ETreppid—Against All Defendants, Except Ascentia Capital Partners, LLC.**

131. Plaintiff realleges and incorporates by reference each allegation contained in paragraphs one

Montgomery FCA Complaint

1  through 130 as though restated here in full.

2  132.  As set forth above, defendants Trepp and eTreppid, with the aid of their co-conspirators,

3  including Congressman Gibbons, Special Agents Haraldsen and West, Venables, and Gray violated the

4  provisions of 31 U.S.C. § 3729 (a).

5  133.  As set forth above, Trepp and eTreppid made illegal political contributions to Gibbons to

6  solicit Gibbons' help in obtaining the said plaintiff U.S. Government defense contracts; said contributions

7  violated express and implied certifications in these contracts with plaintiff U.S. Government, and Trepp

8  and eTreppid were not in compliance with these express and implied certifications, laws, regulations, and

9  statutes.

10  134.  When Montgomery left eTreppid in January 2006, Trepp contacted Congressman Gibbons

11  with regard to Montgomery in order to obtain Gibbons' help in stealing Montgomery's technology so he

12  Trepp could continue receiving payments from plaintiff U.S. Government on the said defense contracts and

13  obtain new contracts.  In turn, Congressman Gibbons contacted his friend Nevada U.S. Attorney Daniel

14  Bogden in an effort to get Bogden to put the resources and prestige of the Reno offices of the FBI and U.S.

15  Attorney behind Trepp to go after Montgomery to steal Montgomery's technology.

16  135.  Under the direction of Nevada U.S. Attorney Bogden, and based upon false and perjured

17  testimony of co-conspirators Haraldsen, Trepp, Venables and Gray, Special Agent West did, in fact, then

18  illegally raid Montgomery's home and storage units in callous disregard of Montgomery's Fourth

19  Amendment rights and in violation of the law, including but not limited to the Fourth Amendment, and

20  DOJ and FBI policies and protocols, including a DOJ policy set forth above.

21  136.  As a direct and proximate result of Trepp, Gibbons, West, and Venables and Gray's

22  violations of the False Claims Act, plaintiff U.S. Government has suffered and continues to suffer damages

3  in an amount to be determined at trial, but in excess of any jurisdictional minimum of this Court.

4  137.  Plaintiff U.S. Government is entitled to treble damages together with punitive damages of

5  $10,000 for each of the six false claims herein as provided in 31 U.S.C. § 3729(a).

6  **FOURTH CAUSE OF ACTION**

27

34

**Conspiracy to Violate the False Claims Act—Against All Defendants**.

138.   Plaintiff realleges and incorporates by reference each allegation contained in paragraphs one through 137 as though restated here in full.

139.   As set forth above, defendants Trepp and eTreppid, with the aid of their co-conspirators, violated the provisions of 31 U.S.C. § 3729 (a).

140.   As set forth above, acting in concert with each other to obtain plaintiff U.S. Government said defense contracts, to share in the proceeds of those contracts, to get plaintiff U.S. Government to pay on the said contracts, and keep the said contracts flowing to Trepp and eTreppid, defendants Trepp, eTreppid, Gibbons, Haraldsen, Venables, Gray and others, did not disclose to the government and concealed from the government the true nature of how the contracts were procured, that Trepp and eTreppid violated the said defense contracts' express and implied certifications, laws, regulations, and statutes, pertaining to said contracts, and Trepp, Gibbons, Bogden, Bath, Haraldsen, West, Venables and Gray lied in order to illegally raid Montgomery's home and storage units, and steal Montgomery's valuable technology used on plaintiff U.S. Government said defense contracts to keep the said defense contracts flowing to Trepp and eTrepid, and each defendant did "conspire to defraud the government by getting a false claim allowed or paid" in violation of 31 U.S.C. §3729 (a)(3).

141.   As set forth above, acting in concert with each other to obtain the said plaintiff U.S. Government defense contracts, to share in the proceeds of those contracts, to get plaintiff U.S. Government to pay on the said contracts, and to keep the said contracts flowing to Trepp and eTreppid, defendants Trepp, eTreppid, and Ascentia did not disclose to the government and concealed from the government the true nature of how the contracts were procured, what Trepp was doing with classified or confidential information obtained from the said defense contracts, including stock trading with said information, Trepp and eTreppid violated express and implied certifications on the said contracts, as wells as laws, rules and regulations pertaining to said contracts, and each defendant did "conspire to defraud the government by getting a false claim allowed or paid" in violation of 31 U.S.C. §3729 (a)(3).

## DEMAND FOR TRIAL BY JURY

Montgomery FCA Complaint

Plaintiff demands a trial by jury on all issues.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests this Court award the following relief:

(a)   General damages in an amount to be proven at trial;

(b)   Treble damages pursuant to 31 U.S.C. § 3729(a);

(c)   $10,000 for each violation of § 3729;

(d)   An award of reasonable attorneys' fees to the *qui tam* plaintiff, pursuant to 31 U.S.C. § 3730(d)(1), and any other award, cost or fees *qui tam* plaintiff is entitled to by law;

(e)   An award of costs, pursuant to 31 U.S.C. § 3730(d)(1);

(f)   Rescission of any existing contract based on the defendants' fraudulent inducement; and

(g)   Such other and further relief as this Court deems just.

Respectfully submitted,

Eric A. Pulver, Esq.

December 12, 2006

36